May it please the court, Michael Freeman appearing on behalf of Petitioner Pawnee Nation of Oklahoma. With me in the courtroom today are Pawnee Nation President Misty Nuttall and past president Walter Echo Hawk. I'd like to reserve three minutes of my time for rebuttal. Respect for tribal sovereignty has been a core tenant of federal environmental law for decades. But in this case, EPA asked this court to find that Congress abandoned that principle in Oklahoma and repealed multiple laws that authorized the Pawnee Nation and other tribes to protect their own sovereign lands and waters. And EPA contends that Congress did so by implication through a midnight rider that was never debated in Congress. That position misreads the rider in multiple ways and it also ignores that the rider had expired years before EPA made the decision in this case. First, with regard to the expiration of the rider, the text of the rider is silent on whether it's permanent. It doesn't include any language suggesting permanence. But on the other hand, it also doesn't include an express sunset date. And faced with that silence, EPA defaulted to the assumption that the rider is permanent. That was a mistake for multiple reasons. Don't we normally see expiration dates in these types of bills? It wasn't a one-year appropriations bill. It was an authorization bill. And I guess as I understand the cases, those normally don't have a fixed expiration date. How do you overcome that problem? Sure. Your Honor, I think the context is important here. This was not an appropriations bill. We're not contending that it was within the strict definition that EPA is using. But Congress funds transportation programs using multi-year authorization bills. They typically run a period of five to six years. And safety was one such bill. It ran from 2005 to 2009. And while there are other measures tacked on to safety, such as the rider in question here, those riders should not be presumed to outlive the statute as a whole and the purpose for which Congress adopted that statute. In looking at congressional intent, and that's the purpose of the presumption against permanence, is to give effect to congressional intent. In assessing congressional intent, courts should look to the fact that what Congress was doing here was to reauthorize transportation programs and funding those programs for a five-year period and not presume that at the same time, Congress was also intending to make permanent changes to unrelated laws, such as the environmental statutes here. Now, EPA argues that the presumption against permanence can only apply to a narrow class of strictly defined appropriations bills. But that's incorrect. As we noted in our brief, the General Accounting Office has recognized that the presumption can also apply to time-limited authorization bills. And that's the security clearances case we cited in our brief. Why do we care what the GAO said after Local Bright? I'm sorry, Your Honor? Why do we care what the GAO said? Because as I think it was the Nevada case in our brief pointed out, courts looked to the General Accounting Office for guidance on the meaning of statutes and presumptions because they were considered to have special expertise on this issue. And the GAO, the exercise of that expertise is recognized that in some cases, the presumption can apply to authorization bills like this one. And the reason for applying it applied to authorization bills like the safety statute for the same reasons that they would apply to appropriations bills. This was a statute that Congress intended that passed to address a time-limited set of program approvals. And it didn't intend to create, it shouldn't be presumed to adopt permanent changes in the law beyond that. When did the Safety Act expire in your view? The Safety Act or the safety rider, Your Honor? The rider. The rider, 2009. The purpose of the bill was to run authorized programs from 2005 to 2009. And at the end of that period, the rider should have expired. Now, the second problem with treating the rider as permanent is that doing so affects an implied repeal of multiple environmental laws in Oklahoma. And EPA doesn't dispute that point in its brief. But your interpretation does the same thing with regard to the 2005 to 2009 period, right? I don't think so, Your Honor. Well, let me ask you to make sure that we're on the same page about why you say that. As far as the TAS provision, that was no longer in place in 2005 to 2009, right? And the provision that states cannot regulate Indian territory, Indian country, as far as 2005 to 2009, that was also implicitly repealed from 2005 to 2009 under the rider, right? Yes, Your Honor. And our point is that the role of the court is to reconcile both statutes to give effect to the language in both of them. And the way it can do that is by treating the rider as temporary in the way you describe it. It displaced the other laws, but only for the period from 2005 to 2009. And that does have the effect of giving effect to both of them, because what it did was to suspend the ability of tribes to get TAS authority and give Oklahoma special power or authority to assume programs on tribal lands for a limited time period. That occurred in the context of a rider that was passed shortly after tribes, such as the Pawnee Nation, began to get TAS approvals for their own programs. And this court should reconcile the rider with the underlying statutes by treating it as essentially a temporary measure to allow for Oklahoma and EPA and the states to accommodate each other in trying to address those issues. But the court doesn't need to treat it as permanent or essentially treat it as repealing the other laws by reading the rider as a permanent law. Was Pawnee running these programs prior to October of 2020? I'm sorry, your? Was Pawnee Nation running the program prior to 2020? So the Pawnee Nation has TAS authority for certain Clean Water Act programs on its land. It got that authority in 2004. And my understanding is that's continued to remain in effect after the rider was passed. But since 2005, when the rider was adopted, no Oklahoma tribes have been able to get TAS authority. It's been zero. It's been completely shut down and that provision has effectively been repealed. What we've suggested, Your Honor, we point out that in our brief, the Auburn Housing Authority case and the Environmental Defense Center versus Babbitt decision both addressed this issue and reconciled the two different laws by treating one of them as temporary. And that gave them both effect. And we think the same approach is appropriate here. Next, the third principle at issue is the Indian Canada construction. And the ability of the Pawnee Nation to protect its sovereign lands and the public health of its members is really a core governmental function for the nation. And the rider is exactly the kind of law that should be read narrowly under that canon. Its text is silent on permanence and there's no relevant legislative history indicating that it's intended to be permanent. This court held in the Pueblo of San Juan case that silence is not sufficient to establish a congressional intent to strip Indian tribes of their authority to govern their own territory. But that's exactly what EPA is saying. You think silence creates an ambiguity here? That's right, Your Honor. Why? I'm sorry, Your Honor? Why? I think because there's A, nothing in the rider that indicates permanence or non-permanence. And I think what you're getting at, Your Honor, is what the default rule is here. If there's nothing in the rider to indicate permanence or non-permanence, what's the assumption that this court should make with regard to that statute? And we think that the answer to that comes in the presumption against permanence, the presumption against implied repeals, and the Indian canon. And I think, you know, the, what EPA is doing here is treating a rider as, a rider for silence on permanence as giving Oklahoma a permanent authority to force tribes to rely on the state for environmental protection on their own lands as a permanent matter. There's no evidence that Congress intended that outcome and the court shouldn't read that result into the rider. Counsel, can I ask you about, I'll say it's the second issue in your brief, so moving past whether or not the rider is still in existence, let's assume it is. As I understand your argument, you say that EPA was wrong to conclude it had no discretion to impose any conditions. But if we would agree with you, would that automatically render that May order invalid such that we must vacate it? That's right, and that's what we were asked before, Your Honor, is that the May 2025 order be vacated. Would you agree, though, the administrator could simply decide not to impose any conditions on Oklahoma? Your Honor, we're not arguing in this case that EPA was required to impose conditions. What we are saying is that the basis for its elimination of those conditions was purely on the mistaken assumption that it didn't have that legal authority. That was contrary to law and should be reversed and vacated on that basis. On remand, if EPA wants to offer another rationale for eliminating the condition, it can try to do so, but that rationale has to be non-arbitrary and supported both in law and on the record as a factual reason. For example, what I'm getting at here is no one suggested that the requirements of the condition that were imposed in January 2025 were unreasonable or unduly burdensome. They're not. They essentially require Oklahoma to give the Pawnee Nation and other tribes a seat at the table and to listen to their concerns and take them into consideration. And we think if EPA thinks that's not appropriate, a remand, it can discuss that issue, but it has to offer a reasoned decision, which it just hasn't done here. Can I ask you a question? I don't want to cheat you out of your rebuttal time, but on this issue that Judge Federico and you were discussing, what do you make of the definite article, the, so in other words, there's a series of verbs. If the administrator determines, if the law, the administrator meets applicable requirements, the administrator approves the state to administer the program, and then if those things happen, the administrator shall approve the state to administer the state program in areas that are in Indian country, which the argument, I think, that's posed to you by your adversary is, well, the is the same program that the administrator previously determined meets the applicable requirements and was approved. And if you add conditions to that, you're no longer talking about the same program. Well, I don't think that's correct. And the reason is that if we're talking about, let's say, a Clean Water Act 303B program, that's the same program regardless of whether EPA is requiring Oklahoma to take some additional steps in administering that same program on Indian lands. And I think the, the, what EPA is doing here is writing limitations into EPA's authority that are not found in the writer. What it's reading the writer to say is it shall approve the program without changes or without additional measures if those preconditions are met. And that's simply not what the writer says. I think the, I think the Supreme Court's decision in Little Sisters of the Poor is relevant here, because what that, what that decision said was where an agency has broad statutory authority, and I think there's no dispute that EPA does have broad authority in its oversight role of these programs, that courts won't read limitations or exceptions into that authority unless those limitations and exceptions are supported by the statutory language. And the writer here is not, doesn't require and doesn't impose those limitations, because it doesn't say anything about not adding any additional stipulations to the program approval. And in your view, the EPA here needed to go through each of the programs that might be applicable to your client and make a contemporaneous finding of current, that it currently meets applicable requirements? Essentially, that's right, Your Honor. The writer requires that EPA make a determination that the program meets applicable requirements. That's framed in the present tense, and under this EPA's reading of this, EPA's reading essentially writes that language out of the statute. How many programs are we talking about? 26, Your Honor. So they've got to go through 26 statutory programs and do what? And determine whether they're actually operating in compliance with law. I should note that that's actually not an unreasonable or unduly burdensome requirement, because under its oversight role, EPA is supposed to be already doing that. It has an obligation in overseeing these programs to make sure that they're in compliance with law and they're being operated consistent with program requirements. So if they're out of compliance, can your organization or the tribe challenge the current operation? Well, Your Honor, first, if the program's out of compliance, EPA shouldn't be approving that and expanding Oklahoma's authority onto tribal lands. That's what the writer says. Let's assume that the delegation's approved here. Are you able to challenge the state or EPA's management of those programs that now affect your client? Your Honor, if EPA were to make a new decision approving this again, and that decision was contrary to the law and not supported by the record, I think the Pawnee Nation, like any other citizen, would have the rights it has available under the Administrative Procedure Act to challenge that. Thank you. I see my time is up. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. I'm Cameron Enohos on behalf of the Environmental Protection Agency. The statutory provision here is straightforward. It says that if Oklahoma has an already approved program operating in the state outside of Indian Country, that upon our request, as long as that program is currently approved, EPA must approve those programs to extend their coverage into Indian Country within the state. There are three main issues I'd like to address today. First, the environmental program's provision has no expressed sunset language, nor has it been repealed, and it is current law. Second, EPA correctly determined that the sole criteria for approving Oklahoma's request was met. And finally, third, EPA has no discretion or authority to add the condition that Pawnee seeks here. On the first issue, as I stated, safety was a law passed by Congress, signed by the President, and unless Congress expressly repeals it or includes sunset language, the Court must treat it as law. Why is that? If it's attached to an authorization bill that was understood to be time-limited to five years, that had numerous provisions throughout it that were going to expire, the appropriations would expire, and for all the reasons that opposing counsel has argued, that we're looking at congressional intents, also permanence, and there's just no indication of that with this language. So I'll say I think that Petitioner here jumps straight into statutory construction and doesn't necessarily sufficiently address whether the presumption applies here. As you say, the statute does include some express sunset language, but it's an 800-page bill, and it includes different provisions that do different things. Some of them expire after one year. Some of them expire after five years. Some of them have no express expiration language. Some create programs. Some provide funding. So it's a big bill that does a number of different things. Yeah, it's over 800 pages, and how many of the sections or provisions within the Safety Act remain in effect today? I'm not entirely sure the number, the exact number that would remain in effect, but anything that did not contain an express sunset language. Can you name any of those sections, though? Yes. There are some sections that contain no express sunset language, so like Section 4137, it removes private organizations' ability to rescind sales of goods, so unless that has been expressly repealed, that's still law. Section 4140A requires the Secretary of Transportation to recognize certain driver's tests, and there's a number of others that created programs or created some substantive law, and again, unless those have been sunset through express, which they haven't here, or later repealed, then our position is that those are currently good law. How do you argue against the Indian canon of construction, though? If we look at this language and say, well, there's no sunset, but there's also no language of permanence, and so in this case we apply the canon for the Pawnee Nation. So our view is that the question of whether the presumption applies is not a question of statutory construction. It's whether a common law presumption applies to this specific act, and so the Indian canon of construction wouldn't apply here. It's not a question of ambiguity in the statute. It's just whether this presumption does apply. Just to make sure that I'm following the answer to Judge Federico's question, I assume, both from what you're saying and from your briefing, that you don't quarrel with the petitioner if we determine that there's an ambiguity. You would agree with the petitioner that the Indian canon of construction trumps your position. In other words, that we should interpret that ambiguity in favor of the Pawnee Nation. And I know you don't think it's ambiguous. Right. We wouldn't say it trumps, but we would say it applies. If you find that there is an ambiguity in the statute, then yes, the Indian canon of construction. Is there anything to help us resolve that ambiguity that counters the Indian canon of construction that would tilt our resolution in favor of the EPA? Sure. For this issue, there's no express language of sunset. So if you're reading the plain language, it's unambiguous. It still applies. There's no expiration. Okay. I have no idea. I'm just not following. So I'm saying the canon only applies if there's an ambiguity. And you're saying there's not an ambiguity. Our position is that there is no ambiguity. I understand that. So if there is an ambiguity, you would agree that we apply the canon of construction. You don't agree that that would lead us to grant a petition for judicial review to reverse because there's something in addition to the canon of construction that counters the canon of construction. My question is what? Our argument rests on whether this provision is ambiguous. All right. If it's ambiguous, you lose. If it's unambiguous, you win. I still think the court would need to apply the statute of construction principles. Sorry for that. I didn't mean to take up so much of your time. But let me ask you a question about the Authorization Act versus it being an Appropriation Act. Do you have a Chenery problem? Because this was not raised in connection at the administrative level. And this seems to be a post hoc rationale. Do you have a post hoc rationale problem under Chenery? We don't have a post hoc problem here because the issues here involve statutory construction and issues of law that are for the court to decide. Under Loper-Bright, the court is to use its best judgment to determine what the statute means here. And so you can forego, I'm not talking about Chevron deference, I'm just talking about whether or not the government can come up with some other, is there any constraint under Chenery that you can come up with any legal argument in a district court or in a circuit court that was not presented to allow at the administrative level to support your position? Can you come up with any legal arguments? For issues of law and statutory construction, certainly, but for issues of facts or policy under the arbitrary and capricious standard, those would need to be adequately explained. So I'd like to turn to the second issue. Before you do that, and I'm sorry to spend so much time on your first argument, but what is the rationale? I mean, it seems to be that everybody agrees that this whole idea of a presumption of being a temporary stems from a 1942 opinion in Menace. And you're relying now on 1 U.S.C. 105 and say, well, it doesn't have the right title for an Appropriation Act. And I don't see anything in Menace that talks about, well, if you don't say an appropriation for the fiscal year ending 2005, it's not a presumption. And if you look at the logical underpinning for the presumption that is a springboard in Menace, what is it in Menace that allows this binary dichotomy between an Authorization Act and an Appropriation Act, one's temporary, one's not, based on what some Senate staffer put in the title? So I would say the distinguishment here is that Menace was dealing with a one-year regular Appropriation Act. So Congress normally does regular Appropriations Acts every year. They're annual. There's 12 of them currently. And so Menace was dealing with one of those, which was understood by everyone to be a one-year annual regular Appropriation Act. And that's true for all of the cases that Pawnee Nation attempts to rely on here. They involve one-year annual Appropriation Acts. And so this is not that. This is a five-year, you know, under Pawnee Nation's view, a five-year bill. It's not a one-year. If it had said just 2000, if everything had been the same, but it said 2005, would your position have changed? Are you saying it's an Authorization Act because it includes five years, not one year? I thought your argument was different. I mean, I don't remember seeing that in your briefing. I thought it didn't have these words. Yeah, it's a couple of things. It's that, A, it doesn't have the words. B, it doesn't originate in the correct committee. Under congressional rules, the jurisdiction is exclusively with the House Committee on Appropriations. Okay, so why does it matter? So what is the logic? Okay, you could say, okay, well, it's not an Appropriation Act. It didn't originate in the right committee in the House for Appropriations. It didn't have the right words in Section 105. So they're saying, well, the case law blurs the two, but let's say it doesn't blur the two. Let's say they're totally different. Tell us what the logic is to say the presumption applies if it originated in one committee. It doesn't apply if it didn't originate in another committee. If it had the right words that's required in the title in 105, then it's presumed temporary. If it doesn't have the right title, if it doesn't use the word appropriation, if it uses the word expenditure because some elegant stylist thought appropriation was too fancy a word, then it doesn't apply. What is the logic of these two distinctions based on the committee and the wording and the title? The logic here is that Pawnee Nation is asking the court to strike a congressional law as expired that doesn't say it's expired. And so it would be good for all parties, Congress, the courts, litigants, the agencies, to know what exactly is an appropriations bill that is subject to this presumption. It is a pretty strong presumption. And so that would be our case is that there is a logic animating this. Can you unpack the rider for me what your position is on whether there's two requirements for approval? And I guess you might as well throw in why it doesn't permit conditional approvals. Sure. So the first part is that the provision lays out a clear sequential series of events. It starts out if the administrator finds determines that a program has met applicable requirements and that program has been approved. Then, sorry, upon a request by the state. So, you know, all of this has to have already happened. Upon a request by the state, EPA shall approve. And that's mandatory language. EPA doesn't get a choice there. As long as it determines that condition is met, it has no discretion. But doesn't it have to make that determination on a recurring basis when the requests are submitted? I mean, the statute or the rider uses present tense with verbs of determines, approves, meets. And as I understand your argument, you're saying once that determination is made, that essentially it exists thereafter every time Oklahoma would ask for authority. That is not correct. So EPA could approve a program and later under its oversight authorities could disapprove or withdraw its approval of said program. So the present tense language of determines and meets applicable requirements are serving an important function where Oklahoma cannot ask for authority to operate a program that has been disapproved for operation outside of Indian country to then now be applicable in Indian country. Otherwise, if it didn't use that present term language, that could be the case. And so it is performing an important function here. So isn't it the case that EPA commonly has a dialogue with, we'll say states in their implementation plans under various environmental statutes where EPA may take issue with some of the plans and there's back and forth. I mean, at the heart of it, it seems to be the EPA exercises discretion regarding all these environmental statutes. So why here do we have to accept that it's just a mandatory approval without any EPA discretion if it determined or if it first says, well, these programs have been approved in the past. So our hands are now tied. Just maybe I'm misunderstanding your question, but EPA does not disavow that it has oversight authority over the programs once they are approved for operation inside of Indian country, just like it maintains its authority outside. And so EPA does take that oversight seriously and is going to continue to do that. So it's not like it has no more authority. It just doesn't have any authority under this approval, under this provision itself. Do some of those other programs have consultation requirements of the 26 programs that would be applicable here? No. All of the programs that were operating prior to McGirt in Indian country were, sorry, the ones at issue in this case were under Oklahoma's programs and there was no government-to-government consultation requirements. And so that was not there before. So it's just the EPA's normal oversight process for those programs? No. Are you asking where the source of the government-to-government consultation is? So that is an EPA policy. I see my time is up. Go ahead and finish. Okay. That is an EPA policy, and that issue is currently before this court in another case that has been argued already with no decision yet, Ute Indian Tribe v. EPA. But either way, our position is still that that policy is not binding law and that the tribal trust responsibility doesn't compel the EPA to impose that policy as law on itself. And so that's where the source is, and there's certainly no authority for EPA to pass along that government-to-government consultation requirement to the states once it's approved a program. All right. Thank you.  Mr. Freeman, if you want two minutes, you can have two minutes of rebuttal. Thank you, Gary. Just a couple of points. First, when considering the authority to impose conditions and the engagement condition as part of the rider, I think it's important to note that EPA hasn't disputed that its existing oversight authority allows it to require some of the various particular steps that are in that engagement condition. For example, the engagement condition requires essentially sharing of information or notice and discussions. And in its brief, EPA doesn't point to anything in that condition that it claims would be disallowed under its ordinary oversight authority. What EPA's position here is that it doesn't have any authority to impose any additional requirements, and that's not consistent with its ordinarily applicable oversight power. I'd also just like to talk, I think, briefly about the other issue, which is the EPA interpretation of the rider as only requiring nothing more than a past program approval. You know, that interpretation ignores the verb tense used in the rider, which is all created in terms of the present tense. It also essentially reads the meets applicable requirements provision out of the statute altogether. And I think EPA's argument ignores the reality of how federal approvals of environmental programs work. This is not a, when programs are approved initially, that's not a one-time event and no approvals ever follow that. There are additional approvals that occur over time based on changes in the law, new circumstances, the water quality standards have to be re-approved every three years by Oklahoma. And so what the rider requires is that EPA assess and determine that, number one, the program is in compliance with all applicable laws as it operates today, and number two, that all of the program approvals are up-to-date and current. And that essentially requires that EPA determine that the program is up-to-date and in compliance with the law before it allows Oklahoma to expand that authority onto tribal lands. Thank you. Thank you, counsel. Appreciate the arguments. You, counsel, are excused and the case will be submitted.